UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

TRACIE SLADE,                    :
              Plaintiff,         :        NO.: 1:09-CV-00541
                                 :
v.                               :        (JUDGE MUNLEY)
                                 :        (MAGISTRATE JUDGE PRINCE)
HERSHEY COMPANY,                 :
              Defendant          :
                                 :
                                 :
_____

## REPORT AND RECOMMENDATION

Pursuant to an Order entered on April 7, 2011 (Doc. 50), Honorable James M. Munley referred defendant's pending motion for summary judgment (Doc. 37) to the undersigned Magistrate Judge for the purpose of preparing a Report and Recommendation.

## I. Background

In this case, plaintiff Tracie Slade claims against defendant Hershey company for a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-1 to 2000e-17, and the Pennsylvania Human Relations Act (PHRA), 43 Pa. Cons. Stat. §§ 951–963, and for disability discrimination in violation of Title I of the Americans with Disabilities Act of 1990 (ADA), Pub. L. No. 101-336, 104 Stat. 328 (codified as amended at 42 U.S.C. §§ 12101–213).

Before turning to the facts of the case, some attention to a threshold matter is necessary: the question of whether Slade's unsworn affidavit, upon which Slade relies in many instances to dispute Hershey's factual claims, should be considered during a discussion of the merits of the pending motion.

*(A) The "sham affidavit" doctrine*

A party may sometimes submit an affidavit "to explain away or patch up an earlier deposition in an attempt to create a genuine issue of material fact." *In re CitX Corp., Inc.*, 448 F.3d 672, 679 (3d Cir. 2006). Although under certain circumstances such affidavits are permissible, courts tend to view these submissions skeptically. Allowing a party "who has been examined at length on deposition" to raise an issue of fact "simply by submitting an affidavit contradicting his own prior testimony" would "greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Martin v. Merrell Dow Pharm.*, 851 F.2d 703, 706 (3d Cir. 1988) (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)). When such an affidavit attempts to raise an issue of fact through a mere "variance from earlier deposition testimony," it is considered a sham affidavit, "and therefore no reasonable jury could rely on it to find for the nonmovant." *Jimenez v. All Am. Rathskeller, Inc.*, 503 F.2d 247, 253 (3d Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (noting that *Liberty Lobby* "specifically recognize[d] the trial judge's power to grant summary judgment on disputed records").

"The main practical reason" for the application of the sham-affidavit doctrine "is that prior depositions are more reliable than affidavits." *Id.* However, "not all contradictory affidavits are necessarily shams," and "[w]hen there is independent evidence in the record to bolster an otherwise questionable affidavit," a court need not disregard it. *Id.* at 254 (quoting *Baer v. Chase*, 392 F.3d 609, 625 (3d Cir. 2004)) (alteration in original). But unless the corroborating evidence can establish that "the affiant was 'understandably' mistaken, confused, or not in possession of all the facts during the previous deposition," or has otherwise provided a "satisfactory explanation" for the discrepancies, "it is appropriate for the district court to disregard the subsequent affidavit and the alleged factual issue in dispute as a 'sham.'" *Id.* (citing *Baer*, 392 F.3d at 625; *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991)).

2

Although Slade's unsworn declaration is not entirely consistent with her deposition testimony, and her declaration includes averments on matters not addressed in deposition, the declaration is not "flatly contradictory" to her deposition testimony, and thus does not present a "clear and extreme" situation that justifies disregarding her declaration as a sham.[1] *See Videon Chevrolet, Inc. v. Gen. Motors Grp.*, 992 F.2d 482, 488 (3d Cir. 1993) (discussing *Hackman*, 932 F.2d at 241, in which the nonmoving plaintiff had submitted an affidavit with statements that were irreconcilable with his earlier testimony). For example, whereas during deposition Slade testified that Dave Walmer told her she was not a team player, her declaration adds the claim that Walmer had never witnessed her behavior or supervised her. (*Compare* Slade Dep. 68:14–20, Oct. 29, 2009, Doc. 44-1, at 3, *with* Slade Decl. ¶ 2, Feb. 22, 2011, Doc. 42-2, at 1.) These statements are not identical, but they are not contradictory, either; both could be true. Similarly, her declaration states firmly that at a meeting in April 2008, "Wayne Mosby agreed to let [her] return to work on the Rollo [sic] line"; Hershey argues that this statement is contradictory because at one point in Slade's deposition testimony, she described her return plans as tentative. (Slade Dep 11:22–24, Doc. 44-1, at 4.) Elsewhere in her deposition, though, she spoke of returning to work as definite. (*Id.* 113:20–23, Doc. 37-2, at 51.) A court "cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition," and the variations between Slade's deposition testimony and her declaration are not great enough to render the declaration "questionable."*Baer*, 392 F.3d at 624–25 (quoting *Kennett-Murray Corp. v. Bone*, 622 F.3d 887, 893 (5th Cir. 1980)). The Court declines Hershey's invitation to disregard Slade's declaration.

---

[1]Although the declaration was not submitted as an affidavit per se, it is substantively the same as one and functions as such. *See* 28 U.S.C.A. § 1746 (West 2011) (allowing unsworn declarations made "under penalty of perjury" to be used as evidence in a contested matter); *Neal v. Kelly*, 963 F.2d 453, 457 (D.C. Cir. 1992) (treating a verified complaint that complied with § 1746 as an affidavit).

*(B) Persons involved*

Hershey hired Slade on July 26, 1982, as a production employee. (Doc. 37-2, at ¶ 1; Doc. 42-1, at ¶ 1.) She worked at Hershey's production facility at 19 East Chocolate Avenue (the Plant), in Hershey, Pennsylvania. (*Ids.* ¶¶ 5.) Although she worked on different lines during her employment, Slade held the position of production employee for the duration of her time with Hershey. (*Ids.* ¶¶ 6.)

Wayne Mosby was the Second Shift Manager at the Plant and was involved with the handling of Slade's leave of absence due to her tree-nut allergy. (*Ids.* ¶¶ 4.) Dave Walmer was the Manager of Labor Relations at the Plant and was also involved with handling Slade's leave of absence. (*Ids.* ¶¶ 8.) Another person involved with Slade's leave of absence was Jessica Czoper, who was a Labor and Employee Relations Specialist with Hershey. (*Ids.* ¶¶ 9.) Jon Peters is the Plant Manager. (*Ids.* ¶¶ 45.)

*(C) Slade's behavior at work*

The record contains little that meaningfully addresses Slade's conduct while on the job at the Plant; most of the relevant evidence consists of vague and general statements in declarations. But it is clear enough that Slade had some degree of difficulty getting along with her coworkers, although how much difficulty is uncertain. (*Compare* Mosby V.S. ¶ 5, Jan. 25, 2011, Doc. 37-2, at 73, 74; Walmer V.S. ¶ 3, Jan. 27, 2011, Doc. 37-2, at 78, 78; *and* Czoper V.S. ¶ 3, Jan. 26, 2011, Doc. 37-2, at 84, 84 (stating the Slade "often" had difficulty getting along), *with* Slade Decl., Doc. 42-2 (stating that disputes "did not often occur").) On one occasion in August 2007, Slade was suspended from work for a day after an investigation into her behavior revealed that her behavior had violated the Personal Interaction portion of Hershey's employee handbook. (Walmer V.S. ¶ 5, Doc. 37-2, at 78, 79; Personnel Action Memo re: Tracy Slade (Aug. 7, 2007), Doc. 37-2, at 71. *But see* Slade Decl. ¶ 3 ("I was given a one-day suspension based on false and

4

unsubstantiated accusations made by a co-worker [sic].").) On "four or five" occasions, Walmer told Slade that she was creating a hostile work environment for her coworkers. (Slade Dep. 80:2–81:2, Doc. 37-2, at 34. *But see* Slade Decl. ¶ 4 ("I did not create a hostile work environment for my co-workers [sic].").)

### *(D) Slade's allergy*

### (1) Learning of her allergy in August 2007

Slade claims to have suffered an allergic reaction to peanuts[2] for the first time in or around August 2007, although Mosby, Walmer, and Czoper all stated that Slade did not tell them about her allergy until sometime in February 2008. (Doc. 37-2, at ¶ 13; Doc. 42-1, at ¶ 13; Mosby V.S. ¶ 6, Doc. 37-2, at 73, 74; Walmer V.S. ¶ 6, Doc. 37-2, at 78, 79; Czoper V.S. ¶ 5, Doc. 37-2, at 84, 85.) These three Hershey employees further stated that until Slade instituted this action, they did not know about any allergy-related problems that Slade suffered before February 2008. (Mosby V.S. ¶ 8, Doc. 37-2, at 73, 74; Walmer V.S. ¶ 8, Doc. 37-2, at 78, 79; Czoper V.S. ¶ 6, Doc. 37-2, at 84, 85.) However, Slade asserted that she told Walmer, Kevin Levering, Jon Peters, and her supervisor Jeff Hammer about her allergy when her first reaction occurred in August 2007. (Slade Decl. ¶ Doc. 42-2, at 2.)

---

[2]Because it is undisputed that Slade is at risk of allergic reactions to both peanuts and tree nuts, and because for the purposes of the pending motion it is immaterial which, at any given time, Slade reacted or might react to, the terms "peanuts," "tree nuts," and "nuts" are used interchangeably.

(2) Second allergic reaction and consequent leave of absence

On February 21, 2008, Slade suffered an allergic reaction to tree nuts at work and informed Hershey of it. (Doc. 37-2, at ¶ 15; Doc. 42-1, at ¶ 15.) As a result of Slade's allergic reaction, Hershey told her to go home and then placed her on a leave of absence. (*Ids.* ¶¶ 17, 22.) Although she did not know it at the time, February 21, 2008, was to be her last day of work at Hershey. (*Ids.* ¶¶ 72.)

(3) Medical documentation and effect of her allergy

Slade subsequently consulted Dr. Jack L. Armstrong, who concluded that Slade suffered from a tree-nut allergy and indicated that Slade should avoid ingesting or inhaling peanuts and tree nuts. (*Ids.* ¶¶ 18.) At the time that Hershey learned of Slade's allergy, she worked directly with tree nuts in a plant where tree nuts and tree-nut particles were widespread. (*Ids.* ¶¶ 21.) Slade acknowledged her risk of exposure to tree-nut particles at work, telling her doctor that there was a potential for exposure at the Plant. (*Ids.* ¶¶ 23.)

In April 2008, Dr. Armstrong recommended that Slade obtain a second opinion on her allergies, which she received from Drs. John Kemp and Timothy Craig on May 8, 2008. (*Ids.* ¶¶ 24, 25.) This second opinion confirmed that Slade was allergic to tree nuts. Dr. Kemp stated that "stict avoidance measures of any ingestions of any peanuts or tree nuts as well as strict avoidance of any environment or handling or exposure to airborne dust of peanuts or tree nuts is the most appropriate course and our recommendation." (*Ids.* ¶¶ 26; Letter from John G. Kemp, DO, to Jack Armstrong, M.D. (May 8, 2008), Doc. 37-2, at 66, 68.) After receiving the second opinion, Dr. Armstrong indicated on June 9, 2008, that he agreed that Slade's best course of action was to strictly avoid both ingestion of peanuts or tree nuts and environments where handling or exposure to airborne dust or particles could occur. (Doc. 37-2, at ¶ 27; Doc. 42-1, at ¶ 27.) Slade provided a copy of her doctors' recommendations to Hershey. (*Ids.* ¶¶ 28.)

6

Slade testified that as a result of her allergy, she has to be "mindful of everything" she does and everything she eats, and that she had to keep her epinephrine autoinjector (EpiPen) and her medication with her at all times. (*Ids.* ¶¶ 29; Slade Dep. 86:13–23, Oct. 29, 2009, Doc. 37-2, at 37.) If Slade inhales or ingests tree nuts, her "throat can close up and [she] can stop breathing and die." (Doc. 37-2, at ¶ 30; Doc. 42-1, at ¶ 30; Slade Dep. 86:3–6, Doc. 37-2, at 37.) She could no longer work around tree-nut allergens and could not go to restaurants where tree-nut allergens were present. (Doc. 37-2, at ¶ 31; Doc. 42-1, at ¶ 31; Slade Dep. 97:13–98:17, Doc. 37-2, at 42–43.) She testified that she had to stop eating at certain restaurants, such as Texas Roadhouse, which served peanuts as snacks and had peanut oil in the wooden floor. (Slade Dep. 98:2–14, Doc. 37-2, at 43.) However, the only time that her condition would require medication is if she were to have an allergic reaction. (Doc. 37-2, at ¶ 32; Doc. 42-1, at ¶ 32.)

(4) Attempts to find a placement or accomodation for Slade at Hershey

The extent to which Hershey worked with Slade to determine whether she could return to work at Hershey given her allergies, or whether Hershey worked with her at all, is a subject of debate. Mosby, Walmer, and Czoper all swear that they did. (Mosby V.S. ¶ 11, Doc. 37-2, at 73, 74; Walmer V.S. ¶ 11, Doc. 37-2, at 78, 80; Czoper V.S. ¶ 9, Doc. 37-2, at 84, 85.) Slade responds that Hershey "failed to fully explore for areas that were nut-free." (Doc. 42-1, at ¶ 33.) For example, she notes, the Rolo production line was in a two-story building in which Rolos, a nut-free candy, were produced on the first floor, with the second floor being entirely office space. (Peters Dep. 18:21–19:15, Aug. 25, 2010, Doc. 42-7, at 4–5.) But Mosby noted that Hershey "[had] nuts everywhere" in its plant (Mosby Dep. 21:14–15, Aug. 25, 2010, Doc. 37-2, at 116), and although the only nuts near the Rolo area were in sealed containers and destined for use elsewhere in the plant, Hershey could not guarantee "that there would not be an airborne exposure due to

ventilation[] anywhere in the plant" (Czoper V.S. ¶¶ 11, 14, Doc. 37-2, at 84, 86; Doc. 37-2, at 91, 93). Moreover, even though the Plant was "supposed to be completely peanut-free" by the end of 2008 (Peters Dep. 18:8–17, Aug. 25, 2010, Doc. 42-7, at 4), such was not the case in the spring of that year, and the elimination of peanuts had no bearing on the presence of tree nuts. In support of the proposition that the Rolo production line was rejected as a possible placement for Slade "based on the uninformed opinion of the head nurse," Slade cites the following testimony:

> Q.   Are you saying that you made a determination that [Slade] could not work in Rolo because Rolo itself was not safe for her?
> A.   The facility itself. We roast almonds within the facility. We have almonds and peanuts that go throughout the facility that service the different lines. So the concern is within the facility, we had tree-nut allergens within our facility.
> Q.   I need to understand. Who had this concern? Was that your concern?
> A.   The concern was from Health Services.
> Q.   And they expressed that to you?
> A.   Yes.
> Q.   Who specifically expressed that to you?
> A.   Kathy Sattelle,[3] who's the head nurse.
> Q.   Did she do any testing to determine that there might be an allergic reaction from Ms. Slade?
>
> . . . .
>
> A.   No, I'm not aware.

(Walmer Dep. 12:21–13:17, Aug. 25, 2010, Doc. 42-9, at 6–7.) Undisputed testimony further establishes that no air-quality testing was conducted for the Rolo area (*id.* 8:4–12, Doc. 42-9, at 4) and that Walmer did not consult with Peters, the Plant Manager (*id.* 14:20–25, Doc. 42-9, at 8).

---

[3]The spelling of Ms. Sattelle's name varies in the materials of record, and nothing indicates which is correct. The Court's choice of the spelling with the double "t" and the double "l" is essentially arbitrary.

A series of meetings convened on the topic of Slade's future at Hershey, the first such meeting taking place on March 27, 2008. In attendance were Slade, Walmer, Czoper, Kathy Sattelle, and Colleen Garrison, Slade's union representative. (Doc. 37-2, at ¶ 34; Doc. 42-1, at ¶ 34.) At this meeting, Sattelle said that it was important "to find out what the parameters of [Slade's] restriction/allergy [are]" before they place her in a different position at Hershey. (Czoper V.S. ¶ 10, Doc. 37-2, at 84, 85; Doc. 37-2, at 90.) Slade states that Hershey "already knew the answer based on a letter from Dr. Armstrong" that was dated four days after the meeting. (Doc. 42-1, ¶ 34 (citing Letter from Jack L. Armstrong, M.D., to Tracie Slade (Mar. 31, 2008), Doc. 37-2, at 57.)[4] During the same meeting, Sattelle told Slade that Hershey would need a written doctor's approval before she could return to work at Hershey. (Doc. 37-2, at 90.)

A second meeting was held on April 8, 2008, attended by Slade, Mosby, Garrison, and Czoper. (Doc. 37-2, at ¶ 36; Doc. 42-1, at ¶ 36.) During that meeting, Czoper noted that Slade's doctors had indicated that she could not return to work until her restriction of "avoidance of nut/peanut allergens" could be met. (*Ids.* ¶¶ 37.) As of the April 8 meeting, Slade's estimated date for resuming work was April 28, 2008, at which point she would be placed on the Rolo production line. (Czoper V.S. ¶ 11, Doc. 37-2, at 84, 86; Doc. 37-2, at 94; Slade Dep. 113:20–22, Doc. 37-2, at 51.) It was nonetheless again made clear that Slade would need to provide a release from her doctor before returning to work at the Plant. (Mosby V.S. ¶ 12, Doc. 37-2, at 73, 75; Czoper V.S. ¶ 13, Doc. 37-2, at 84, 86.) Slade described her intended return to work as a definite matter. (*See* Slade Decl. ¶ 7, Doc. 42-2, at 2 ("At an April meeting Wayne Mosby agreed to let me return to work on the Rollo [sic] line.").)

---

[4]Plaintiff's exhibit purporting to be Armstrong's letter of March 31, 2008, is actually nothing more than a cover page. (Doc. 42-3.)

Although the possibility was discussed that Slade might return to work with the use of a mask, Hershey requested that Slade get documentation from her physician recommending a mask and releasing Slade to return to work using a mask, but Slade never provided any such documentation. (Doc. 37-2, at ¶ 39; Doc. 42-1, at ¶ 39.) Walmer stated: "[I]t was ultimately decided that, because masks did not provide one hundred percent protection and Ms. Slade's doctors did not indicate that a mask would be acceptable to allow [her] to work in the Plant, [she] could not return to work with the use of a mask." (Walmer V.S. ¶ 12, Doc. 37-2, at 78, 80.) When asked why Hershey was unable to provide Slade with a mask, Mosby responded: "We couldn't determine what was suitable for her allergen. We didn't know what type of mask to get her. And we asked for recommendations from her physician on what we could do, and they would not provide it." (Mosby Dep. 17:3–8, Aug. 25, 2010, Doc. 37-2, at 114.) Slade explained her understanding of why she was unable to come back to work on April 28, she said:

> Dave Walmer came back to work and he said that there was—I received a letter saying that there was almonds on the floor above Rolo. And if there is almonds on the floor above Rolo, then everyone on the floor would be affected if the air would get down through there. So it doesn't make sense to me.

(Slade Dep. 113:20–114:8, Doc. 37-2, at 51–52.)

No one ever actually conducted any tests to determine whether there was a part of the Plant that was free of peanut or tree-nut allergens. Czoper stated that according to Slade at the meeting of April 8, 2008, she could not return to work until an air analysis was performed. (Czoper V.S. ¶ 12, Doc. 37-2, at 84, 86.) Walmer told a slightly different story. During deposition, he was asked: "[W]ere you involved in any meetings and/or conversations with Ms. Slade in which she was given specific permission to have someone come in and test air quality at the plant?" His answer: "Yes. We had requested Tracie to have her doctor do that. We were open to that for placement." (Walmer Dep. 18:12–17, Doc. 37-2, at 108; *See also* Slade Decl. ¶ 8 ("Hershey management insisted

10

that my doctor conduct an air quality analysis before I could return to work.").) A letter from Dr. Armstrong to Slade reads, in part: "This is in response to the request to walk through the facility to see if certain areas would be safe for you to work in. Unfortunately, I do not have the equipment to measure peanut or tree-nut levels in the air." (Letter from Jack L. Armstrong, M.D., to Tracie Slade (March 31, 2008), Doc. 37-2, at 57).) Hershey had no such equipment, either; the only kind of air-testing equipment that Hershey had was for measuring oxygen levels in a confined space. (Mosby Dep. 13:3–23, Aug. 25, 2010, Doc. 37-2, at 113.) Peters testified that Hershey did no quality-assurance testing for peanut or tree-nut allergens. (Peters Dep. 29:21–30:3, Doc. 37-2, at 120–21.)

*(E) Slade's work environment at Hershey*

As the parties present the issue, the facts relating to Slade's hostile-work-environment claim are almost entirely expressed in two excerpts from her deposition testimony. First:

> Q.   Tell me exactly how you were subjected to a hostile work environment during that time.
> A,   I was constantly called down front.
> Q.   When you say called down front, what does that mean?
> A.   I was constantly called down front by Dave Walmer, who is the human relations manager, . . . for trivial matters. It was embarrassing, demeaning. It became a joke in [the Wrapping department].

(Slade Dep. 59:4–13, Doc. 37-2, at 31.) Then, in support of her claim that white coworkers were not treated as she was:

> Q.   Anything else in connection with your hostile work environment based on your race?
> A.   Other than being treated unfairly, I wasn't treated as an equal. When you have a white person doing the same job that you're doing, and you're getting called down front, they're doing the exact same job, they're not getting called down front. They're not being reprimanded. They're not being told they're a team player, they're getting praise.
> Q.   Anything else?

11

. . . .

A.   The race issue, how the floor foreman would ask me to open up—to break down cartons, but she didn't ask anyone else and it was all of us standing there. I was the only black standing there. And she asked me, Tracie, break these cartons down and she said it and it was three or four of us standing there. I was the only black.

The other three girls turned and walked away and went into the break room. And I went and took a break, I came back out and I asked the two white girls that were there, did she ask you to break these down? They said no, so we all broke them down together. I was singled out for that. You know, we're on a unit, but yet I was the only one asked to do these jobs.

. . . .

Q.   Was it in 2006?
A.   No. It was right—the year I left.

(*Id.* 70:5–71:24, Doc. 42-8, at 4–5.[5])

Slade did not know whether other black or white employees were called down front. (Doc. 37-2, at ¶ 65; Doc. 42-1, at ¶ 65.) Walmer, who Slade accused of creating the hostile work environment, never said anything to her about her race. (*Ids.* ¶¶ 66.) Slade claimed that the one-day suspension imposed on her on August, 9, 2007, was the result of a false accusation, but the people that actually imposed the suspension, Walmer and Kevin Livering, never said anything to her about her race. (*Ids.* ¶¶ 68–69.) The only race-related verbalization that Slade recalled was being told that one of her coworkers had called her "the N word." (*Ids.* ¶¶ 70.)

---

[5]Plaintiff had also cited page 61 of her deposition, but that page appears nowhere in the record.

**II. Standard of Review**

Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56(c) of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56(e) to go beyond the pleadings with affidavits, depositions, answers to interrogatories, or the like in order to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The party opposing the motion "must

do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). When Rule 56(e) shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case that it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

## IV. Discussion

### (A) Hostile work environment

In order to establish a hostile-work-environment claim under Title VII or the PHRA,[6] a plaintiff must show that (1) she suffered intentional discrimination because of her race; (2) the discrimination was pervasive and regular; (3) it detrimentally affected her; (4) it would have detrimentally affected a reasonable person of the same protected class in her position; and (5) there is a basis for vicarious liability. *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001).

Establishing whether there is a hostile work environment is often a complex inquiry, as "any analysis is filled with pitfalls and ambiguities. . . . [A] discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Id.* at 261 (quoting *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 149 (3d Cir. 1999)) (internal quotation marks omitted). However, "offhanded comments" and "isolated incidents

---

[6]Hostile-work-environment claims under Title VII and the PHRC are adjudged under the same standard. *Knabe v. Boury Corp.*, 114 F.3d 407, 410 n.5 (3d Cir. 1997) (citing *West v. Phila. Elec. Co.*, 45 F.2d 744 (3d Cir. 1995); *Hoy v. Angelone*, 691 A.2d 476 (Pa. Super. 1997)).

(unless extremely serious)" are not sufficient to sustain a hostile-work-environment claim; rather, the "conduct must be extreme enough to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citing *Carrero v. N.Y. City Housing Auth.*, 890 F.2d 569, 577–78 (2d Cir. 1989); *Moylan v. Maries County*, 792 F.2d 746, 749–50 (8th Cir. 1986). In order for conduct to amount to a change "in the terms and conditions of employment," it must be "extreme." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1988).

Although "overtly discriminatory statements or conduct" by a plaintiff's supervisors are not required to establish the first element, intentional racial discrimination, "the presence or absence of such conduct often proves helpful when evaluating whether facially neutral conduct is driven by invidious motives." *Wickham v. Walls*, No. 09-4690, 2010 WL 5166387, at *8 n.1 (3d Cir. Dec. 21, 2010). The Third Circuit has held that a plaintiff, who was never subject to any "racist comment, written or spoken," could not establish intentional racial discrimination against him "*solely* by pointing to comments that were directed at other individuals." *Caver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005). Further, the "mere utterance of an epithet, joke, or inappropriate taunt that may cause offense does not sufficiently affect the conditions of employment to implicate Title VII liability." *Weston v. Pennsylvania*, 251 F.3d 420, 428 (3d Cir. 2001) (citing *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)).

In this case, plaintiff's hostile-work-environment claim requires little more attention by the Court than it has been given by the parties throughout the course of litigation thus far. Even viewing the record in the light most favorable to the plaintiff, her evidence of a hostile work environment consists entirely of the following: being suspended for one day in 2007 based on unsubstantiated allegations by a coworker; Walmer telling her on four or five occasions that she was creating a hostile work environment for her coworkers; being "constantly called down front" by a manager for

15

"trivial matters," making her feel embarrassed and demeaned; on one occasion in 2008, she alone—of "three or four" employees apparently standing idle, plaintiff being the only black employee in the group—was asked to "break down cartons" by the floor foreman; and being told by an unspecified person that one of her coworkers had called her "the N word." She has admitted that Walmer, who she alleged in particular was responsible for creating the hostile work environment, never said anything to her about her race; and that Kevin Livering, who along with Walmer imposed her suspension in 2007, never said anything to her about her race, either.

These few instances of supposedly hostile treatment evince no link between plaintiff's treatment and her race, no pattern of pervasiveness or regularly, and no effect on the terms and conditions of her employment. Plaintiff admitted that the issue of race never overtly entered her workplace except in the one instance where she was told that a coworker called her "the N word." This singular occurrence sheds no light on the work environment because it was isolated in time, it was a "mere utterance of an epithet, joke, or inappropriate taunt that may cause offense," *Faragher*, 524 U.S. at 788, and was said not to plaintiff herself but to some third party that simply repeated the comment to plaintiff. No less important, this comment was made by a coworker, not a manager, and under these circumstances, vicarious liability can be imposed on the employer "only if the employer failed to provide a reasonable avenue for complaint, or alternatively, if the employer knew or should have known of the harassment and failed to take prompt and remedial action." *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (citing *Weston*, 241 F.3d at 427).

As for plaintiff's "constantly being called down front," plaintiff admitted that she had disputes with coworkers, even if not often. She described the reasons for her being called down as "trivial," but introduced no evidence to show, or even suggest, that management's apparently ongoing concerns with her behavior were baseless. And even if plaintiff

felt embarrassed and demeaned, and her being frequently summoned by Walmer had become a joke in the Wrapping department, nothing in the record suggests that "the harassment so altered working conditions as to 'ma[k]e it more difficult to do [her] job.'" *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring) (quoting *Davis v. Monsanto Chem Co.*, 852 F.2d 345, 349 (6th Cir. 1988)) (first alteration in original).

A review of the overall scenario at Hershey makes it clear that plaintiff was never subjected to the sort of "extreme" conduct necessary to establish a claim for a hostile work environment, and it is therefore recommended that Count I of plaintiff's complaint be dismissed.

### (B) The Americans with Disabilities Act

A claim of unlawful discrimination on the basis of her disability brought under Title I of the ADA is analyzed using the three-part framework of *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973). *See Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661 (3d Cir. 1991) (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 180 (1989)) (noting that the ADA and Title VII both serve "to prevent discrimination in employment against members of certain classes," and "it follows that the methods and manner of proof under one statute should inform the standards under" the other). Under this framework, the plaintiff bears the initial burden of making out a prima facie case under the ADA. If the plaintiff establishes a prima facie case, a presumption of discriminatory action arises. *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977)). The burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802). If the defendant successfully rebuts the presumption of discrimination, the burden of production finally shifts back to the

plaintiff, who must produce evidence sufficient to allow a reasonable fact-finder to conclude that the proffered reasons for the adverse employment action were a pretext for illegal discrimination or retaliation. *Id.* at 799.

A prima facie case of discrimination under the ADA consists of a showing that the plaintiff (1) is disabled within the meaning of the ADA; (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) has suffered an otherwise adverse employment decision as a result of discrimination. *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998) (citing *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996)).

(1) Whether plaintiff is disabled

Plaintiff alleges that she is disabled within the meaning of the ADA. There are three statutory definitions of "disability": (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual"; (2) "a record of having such an impairment"; or (3) "being regarded as having such an impairment." 42 U.S.C.A. § 12102(1)(A)–(C) (West 2011). Plaintiff presents arguments under all three definitions of "disability," although she does not indicate which of her major life activities is substantially limited. In the context of this case, the only reasonable assumption is that the major life activity in question is "working."[7] *Id.* § 12102(2)(A).

_____

[7]Plaintiff seems to suggest that the relevant major life activity is "breathing" (Doc. 42, at 8), but it is undisputed that unless plaintiff is actually being exposed to peanut or tree nut allergens, she has no trouble breathing. Hypothetical problems that plaintiff might at some point suffer do not constitute a disability. *See* 29 C.F.R. § 1630.2(j)(iv) (2011) (requiring "a degree of *functional* limitation" for a finding of substantial limitation of a major life activity) (emphasis added.) It is further undisputed that since plaintiff's allergic reaction in February 2008, she has suffered no significant reactions, has had no breathing difficulty except during a test with Dr. Armstrong, and has never had to use her EpiPen.

In order to be considered substantially limited in the major life activity of working, a person must be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills[,] and abilities." 29 C.F.R. § 1630.2(j)(3)(i) (2011). The regulation continues: "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.*

As evidence of her disability, plaintiff cites her doctors' recommendations that she maintain strict avoidance of peanuts, tree nuts, and environments where there is a possibility of exposure to nuts or airborne particles of nuts. She also quotes a letter from Dr. Armstrong, which states: "[S]he did have an objective finding of a 15% decrease in her lung function . . . ." (Doc. 42, at 3 (citing Letter from Jack L. Armstrong, M.D., to Hershey Company (Mar. 12, 2008), Doc. 37-2, at 56.) But what plaintiff omitted in her brief opposing summary judgment is the remainder of the sentence in Dr. Armstrong's letter, as well as the context of the sentence, which completely changes its meaning. As plaintiff presented this evidence, it sounds as though Dr. Armstrong was reporting a permanent decrease in lung function, when in fact he was reporting results of a test in which plaintiff had just eaten peanuts. And with that context in mind, the sentence that plaintiff only partially quoted actually reads: "[S]he did have an objective finding of a 15% decrease in her lung function which returned to normal after bronchiodilator." (Letter from Jack L. Armstrong, M.D., to Hershey Company (Mar. 12, 2008), Doc. 37-2, at 56.) Dr. Armstrong's letter thus says something quite different from what plaintiff portrayed it to say:[8] plaintiff suffers no chronic, permanent decrease in lung function, but rather suffers a temporary, even if severe, reaction to peanuts following exposure.

---

[8]The Court declines at this time to consider whether plaintiff's counsel violated any applicable laws or regulations by misrepresenting the contents of Dr. Armstrong's letter.

It is undisputed that plaintiff's doctors advised strict avoidance of peanuts, tree nuts, and airborne particles of peanuts and tree nuts, an exhortation that plaintiff herself agreed with. This evidence establishes that plaintiff could not continue to work in a way that brought her into direct contact with nuts, but this is not enough to prove that she is disabled. Plaintiff introduced no evidence and presented no argument to show that she was "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills[,] and abilities." 29 C.F.R. § 1630.2(j)(3)(i) (2011). Plaintiff could readily have continued to perform the same kind of work that she had been doing as a production employee as long as she was not exposed to nuts or airborne nut particles. She has introduced no evidence that shows that she had or would have "difficulty in obtaining other jobs in [her] field." *Gupton v. Commonwealth of Virginia*, 14 F.3d 203, 205 (4th Cir. 1994) (quoting *Forrisi v. Bowen*, 794 F.2d 931, 935 (4th Cir. 1986)).

Because plaintiff failed to introduce evidence showing that she was significantly restricted in a major life activity, there is no basis for a finding that she was disabled. It follows that there is also no basis for a finding that plaintiff had a record of being disabled. *See* 42 U.S.C.A. § 12102(2)(B) (West 2011) (providing that an individual has a "disability" if the individual has a record of having an impairment that "substantially limits one or more of [the individual's] major life activities"). *See also, e.g.*, *McKay v. Toyota Motor Mfg., U.S.A., Inc.*, 110 F.3d 369, 379 (6th Cir. 1997) (dictum) ("[A] person who is limited in his or her ability to perform only a particular job, because of circumstances unique to that job site or the materials used, may not be substantially limited in the major life activity of working."); *McLorn v. Cmty. Health Servs.*, 456 F. Supp. 2d 991, 997 (S.D. Ill. 2006) (holding that an employee with a latex allergy, whose job required him to wear latex gloves, was not substantially limited in a major life activity as a result of his allergy). *Cf. EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 617

20

(5th Cir. 2009) (citing *EEOC v. United Parcel Serv.*, 249 F.3d 557, 562–63 (6th Cir. 2001) (holding that a plaintiff whose allergies forced him to spend all of his nonworking hours in bed was substantially limited in the major life activity of caring for himself)); *Land v. Baptist Med. Ctr.*, 164 F.3d 423, 425 (8th Cir. 1999) (citing *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1206 (8th Cir. 1997)) (holding that an allergy to peanuts affected eating and breathing, but did not substantially limit those major life activities)). *See generally Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 723–24 (2d Cir. 1994) (collecting cases). There is no support in the language of the ADA itself, the implementing regulations, or case law from any Circuit Court for the proposition that plaintiff's inability to perform a particular job under particular conditions constitutes a disability.

### (2) Whether plaintiff was regarded as disabled

Plaintiff argues alternatively that she was "regarded as" disabled by defendant, *id.* § 1630.2(g)(3), a separate route to supporting a disability-discrimination claim. An employee is "regarded as" disabled "when an employer 'misinterpret[s] information about an employee's limitations to conclude that the employee is incapable of performing a wide range of jobs,'" or if "for no reason whatsoever an employer regards a person as disabled." *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 381 (3d Cir. 2002) (quoting *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 190–91 (3d Cir. 1999)).

To support her argument, plaintiff makes the blanket statement that defendant "has at all relevant times admitted it regarded [her] as having a disability." (Doc. 42, at 7.) She describes defendant's attempts to find her a place to work at the Plant that would not aggravate her allergy, and defendant's eventual decision that work on the Rolo line would be an inadequately controlled environment for plaintiff, as evidence that defendant regarded exposure to nut allergens as "an unacceptable health risk that substantially limited the major life activity of breathing." (*Id.* at 8.)

21

But whether the major life activity at issue is breathing or working, plaintiff's argument that she was "regarded as" having a disability fails for the same reason that she cannot establish that she had a disability in any other sense. The evidence establishes that defendant regarded plaintiff as having an allergy to peanuts and tree nuts—but nothing more. Defendant viewed plaintiff as suffering from a transient impairment when, and if, she was exposed to nut allergens, but not as suffering from a chronic impairment of her ability to breathe generally. Defendant never considered plaintiff incapable of performing a wide range of jobs; in fact, it tried to find her work in the same position she had held, production employee, with the only difference being a lack of exposure to nut allergens. An employer who believes, even erroneously, "that a person is incapable of performing a particular job will not be liable under the ADA." *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 192 (3d Cir. 1999).

(3) Consequence of plaintiff's failure to prove disability

Because plaintiff has not shown that she suffered from a disability, she cannot succeed in her claim of disability discrimination. Since defendant's duties under the ADA would trigger only if plaintiff were disabled, defendant never had a duty to provide a reasonable accommodation to plaintiff. Indeed, showing that the plaintiff suffers from a disability is a crucial element of any claim under the ADA; and since plaintiff could not make such a showing, there is no reasonable basis for any conclusion but that her ADA claims fail.

**V. Recommendation**

It is recommended that defendants' motion for summary judgment be GRANTED, and plaintiff's complaint be DISMISSED.

s/ William T. Prince
William T. Prince
United States Magistrate Judge

April 15, 2011